## A11A0903. CARTWRIGHT et al. v. FUJI PHOTO FILM U.S.A., INC.

(720 SE2d 200)

ELLINGTON, Chief Judge.

In this case arising from an alleged breach of contract and fraudulent transfer of funds, defendants Robert and Mindy Cartwright appeal from an order of the State Court of Fulton County denying their motion to dismiss or, in the alternative, transfer the case to Taylor County.[1] The Cartwrights contend that the trial court erred in ruling that Fulton County is the proper venue for the complaint, given that they are residents of Taylor County. For the following reasons, we affirm.

"The denial of a motion to transfer is reviewed for an abuse of discretion, and we will affirm the trial court's findings on disputed factual questions relating to venue if there is any evidence to support them. But we review de novo the trial court's application of the law to undisputed facts." (Citations omitted.) *HD Supply v. Garger*, 299 Ga. App. 751 (683 SE2d 671) (2009). The record on appeal shows the following facts.

In 1993, Daniel Schooler, Timothy Schooler, and The Schooler Group, Inc. (collectively, "the Schoolers") and Fuji Photo Film USA, Inc. ("Fuji") verbally agreed to an arrangement under which the Schoolers agreed to assist Fuji in seeking an account with the Eckerd Drug Store chain. According to the Schoolers, several unidentified officers of Fuji promised them that, if they assisted Fuji in obtaining the Eckerd account, Fuji would pay them a three percent brokerage commission on the account for at least seven years. In 2000, a Fuji vice president, Robert Cartwright (one of the appellants), executed a "Food and Drug Broker Agreement" ("broker agreement") with the Schoolers; the broker agreement provided that the Schoolers would, in fact, receive a three percent commission on all purchase orders from Fuji's newly-acquired Eckerd account. Instead of guaranteeing those commissions for seven years, however, the broker agreement stated that it was terminable at any time by either party with thirty days written notice. It also contained an "entire agreement" clause stating that it superseded all previous oral or written agreements between the parties.

In late 2002, Fuji concluded that the Schoolers were not performing their duties under the broker agreement and, as a consequence, the agreement was no longer cost effective. Fuji terminated the broker agreement in January 2003. Four months later, the Schoolers filed suit against Fuji and one of Fuji's account managers,

---

[1] This Court granted their application for interlocutory appeal.

Patrick Patten, alleging that Fuji had defrauded them and breached its oral promises to pay them commissions on the Eckerd account for at least seven years. It also alleged that Patten had intentionally and maliciously induced Fuji and/or Eckerd to discontinue their business relationships with the Schoolers. Because Patten resided in Fulton County, the Schoolers filed their complaint in the State Court of Fulton County.

Fuji and Patten filed a joint answer, denying the Schoolers' assertions and alleging, inter alia, that the Schoolers' claims were barred by unclean hands, the express terms of the broker agreement, and the Schoolers' breach of that agreement. In addition, Fuji, acting alone, filed a counterclaim in which it asserted that the Schoolers breached the broker agreement and breached their duties of trust and confidence and duties arising from its confidential relationship with Fuji and alleged that the Schoolers committed their wrongful actions wilfully, recklessly and in bad faith.

In December 2007, the Schoolers dismissed their complaint against Fuji and Patten without prejudice, thereby leaving only Fuji's counterclaim against the Schoolers pending before the trial court. Consequently, the court realigned the parties and changed the style of the case to reflect that Fuji was, henceforth, the plaintiff and the Schoolers were the defendants.

During discovery, Fuji deposed Timothy Schooler, Daniel Schooler, and Joyce Schooler, as well as Robert Cartwright and Patrick Patten. Fuji learned that, as soon as the Schoolers started receiving payments from Fuji under the written broker agreement in 2001, the Schoolers began secretly funneling about 20 percent of each of the payments to Robert Cartwright's wife, Mindy. In fact, in 2001 and 2002, the Schoolers paid Mindy Cartwright at least $90,000 as a result of this arrangement and, although the Schoolers issued her 1099 federal tax forms for such payments, she provided virtually no services for the Schoolers in return. Notably, the payments to Mindy Cartwright ended on January 20, 2003, just days after Fuji terminated its agreement with the Schoolers. In addition to those payments, Fuji learned that, during the same two-year period, the Schoolers sold the Cartwrights real property in Georgia for less than twenty-five percent of the Schoolers' basis, resulting in an undisclosed transfer of approximately $77,000 to the Cartwrights while the Schoolers were still receiving payments from Fuji under the broker agreement.

After learning of the secret financial dealings between the Schoolers and the Cartwrights, Fuji repeatedly sought tax and financial documents from the Cartwrights. With the exception of providing two pages, however, the Cartwrights refused to provide the documents, claiming that they no longer possessed the requested

documents, that the documents were privileged, and/or that Fuji's requests were improper. The trial court ultimately granted in part a motion to compel the requested documents that was filed by Fuji and denied a motion for a protective order filed by the Cartwrights.[2]

While discovery was still on-going, Fuji amended its complaint to include a claim for fraud, alleging that the Schoolers were involved in an illegal "kickback" scheme with Robert and Mindy Cartwright. Then, in December 2009, Fuji filed a motion to add the Cartwrights as party defendants. The trial court granted the motion on February 13, 2010. Fuji then filed a second amendment to its complaint, asserting that the Cartwrights and the Schoolers were joint tortfeasors in its fraud claim.

On February 19, 2010, the Cartwrights filed a motion to dismiss Fuji's complaint against them on the basis of improper venue or, in the alternative, to transfer the case to Taylor County, where they have resided since approximately 2005. Daniel and Timothy Schooler also resided in Taylor County at the time of their 2003 initiation of their lawsuit against Fuji and Patten and at the time Fuji added the Cartwrights as co-defendants in its suit against the Schoolers.[3] In March 2010, in response to the Cartwrights' motion to transfer, Fuji filed another amendment to its complaint to include the following assertion as to the issue of venue:

> The Schooler defendants, by initiating this action originally, have subjected themselves to the jurisdiction and venue of this Court. Defendants Robert Cartwright and Mindy Cartwright were residents of the State of New York both at the time of [the] filing of this lawsuit in 2003 by the Schooler defendants, and at the time that all defendants devised and implemented the wrongful scheme and committed the wrongful acts described [in this complaint] through at least May 2004. The Cartwright defendants also assisted the Schooler defendants in the preparation and pursuit of this lawsuit filed by the Schooler defendants in Fulton County, Georgia, and, as described [herein], the Cartwright defendants had a beneficial interest in the claims asserted by the Schooler defendants in this lawsuit. As described [herein],

---

[2] In its order on the motion to compel, the trial court warned the Cartwrights that their failure to comply with the order may result in the imposition of sanctions, including the assessment of fees and/or a finding of contempt and incarceration. In February 2010, the trial court found that the Cartwrights were in contempt of the order on the motion to compel. The Cartwrights' appeal from the contempt order was the subject of a related case, Case No. A11A1929. This Court dismissed that appeal as moot on October 18, 2011.

[3] Neither Daniel nor Timothy Schooler joined the Cartwrights' motion, nor did they file a separate motion to dismiss or to transfer.

(a) the filing in 2003 and pursuit of this lawsuit since 2003 in Fulton County by the Schooler defendants as assisted by the Cartwright defendants, as well as (b) all defendants' concealment of evidence in the Fulton County lawsuit that defendants had legal duties to disclose, and misrepresentations made by all defendants to conceal what they had a duty to disclose, were wrongful and tortious acts in furtherance of the scheme and conspiracy to defraud Fuji[.] . . . Pursuant to that scheme and conspiracy to defraud Fuji and commit the wrongful acts described herein, in which all [of the] defendants have been involved in the same transactions and occurrences, all [of the] defendants have committed substantial tortious acts and violations of duties to Fuji in Fulton County, Georgia. All [of the] defendants are subject to the jurisdiction of this Court, and venue is proper in this County and Court as to all [of the] defendants.

In September 2010, the trial court denied the Cartwrights' motion to dismiss or to transfer, and the Cartwrights appeal.

1. The Cartwrights contend that the trial court erred in ruling that the joint tortfeasor provision of the Georgia Constitution[4] supported venue in Fulton County. However, given our conclusions in Divisions 2 through 4, infra, that, in the alternative, venue was proper in Fulton County under Georgia's Long Arm Statute and the relation-back statute, this alleged error is moot.

2. The Cartwrights contend that the trial court erred when it ruled that Fuji's 2010 amended complaint, in which it first named them as co-defendants with the Schoolers, related back to its 2003 counterclaim, pursuant to OCGA § 9-11-15 (c).

OCGA § 9-11-15 (c), Georgia's relation-back statute, provides as follows:

Whenever the claim or defense asserted in the amended pleading arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party[5] against whom a claim is asserted relates back to the date of

---

[4] See Ga. Const. of 1983, Art. VI, Sec. II, Par. IV (providing that joint tortfeasors residing in different counties within Georgia may be tried in either county).

[5] "Although OCGA § 9-11-15 (c) refers to 'an amendment *changing* the party,' the ambit of the relation back provision has been construed to include cases where, as here, the plaintiff adds rather than substitutes a new party defendant." (Citations and footnote omitted; emphasis in original.) *HD Supply v. Garger*, 299 Ga. App. at 754 (1).

the original pleadings if the foregoing provisions are satisfied, and if within the period provided by law for commencing the action against him the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.

In order to invoke the relation-back provisions, the plaintiff must demonstrate that three conditions are met:

(1) the amendment adding the new defendant arose out of the same facts as the original complaint; (2) the new defendant had sufficient notice of the action [so that] he will not be prejudiced in maintaining his defense on the merits[ ]; and (3) the new defendant knew or should have known that but for a mistake concerning his identity as a proper party, the action would have been brought against him.

(Citation and punctuation omitted.) *Pazur v. Belcher*, 272 Ga. App. 456, 458 (2) (612 SE2d 481) (2004). "The provisions of [OCGA § 9-11-15 (c)] should be liberally construed to effect its purpose of ameliorating the impact of the statute of limitation." (Citation and punctuation omitted.) *Herndon v. Heard*, 262 Ga. App. 334, 337 (1) (585 SE2d 637) (2003).

(a) In this case, the Schoolers' original 2003 complaint, Fuji's counterclaim, and Fuji's 2010 amended complaint against both the Schoolers and the Cartwrights all asserted claims that arose directly from the alleged oral agreement and the subsequent written broker agreement between Fuji and the Schoolers. In fact, Robert Cartwright, as one of Fuji's vice presidents, negotiated and signed the broker agreement on behalf of Fuji. As shown above, as soon as the Schoolers started receiving payments from Fuji under the broker agreement in 2001, while Robert Cartwright was still employed by Fuji, the Schoolers began secretly funneling 20 percent of each of the payments to the Cartwrights. Ultimately, in 2001 and 2002, the Cartwrights received at least $90,000 from the Schoolers as a result of this arrangement, a fact that they jointly concealed from Fuji for several years. Thus, due to the active concealment of this arrangement (which was not only related to the broker agreement, but was apparently contingent on the agreement), Fuji was prevented from knowing that the Cartwrights had a significant, undisclosed financial interest in the broker agreement from the contract's very inception when it (Fuji) filed its counterclaim against the Schoolers in 2003.

Under these circumstances, we conclude that the trial court was authorized to find that all of the relevant claims in this case arose out of the same facts, conduct, transaction or occurrence, pursuant to OCGA § 9-11-15 (c).

(b) Although the Cartwrights argue that they lacked sufficient notice of the filing of the original action, this argument lacks merit. The evidence shows that, when the Schoolers filed the 2003 lawsuit, Fuji's general counsel immediately informed Robert Cartwright, in his capacity as the Fuji vice president who was directly involved with the Schoolers in the transactions at issue; that the counsel and Cartwright repeatedly discussed the litigation until Cartwright resigned from Fuji in 2004; that Cartwright actively assisted the counsel in responding to discovery requests and in gathering documents requested by the Schoolers; and that, as a result, Cartwright was well aware of the litigation since its inception. In addition, Robert Cartwright was deposed about the pending claims in 2004 and knew that they involved disputes about the broker agreement between Fuji and the Schoolers. As for Mindy Cartwright, as shown above, the Schoolers paid her at least $90,000 in 2001 and 2002 and issued 1099 federal tax forms for such payments, despite the fact that she provided no services for the Schoolers in return. Then, she and her husband repeatedly obstructed the discovery of their relevant financial documents through disingenuous claims that they no longer possessed the documents, the gross misrepresentation of other facts, and, ultimately, the active concealment of the documents until Fuji's discovery of such documents by other means was inevitable.

Given this evidence, we find that the trial court was authorized to conclude that "it goes beyond mere speculation to assume that the Cartwright Defendants had actual knowledge of the litigation" and that a ruling that Fuji's amended complaint adding claims against them related back to 2003 would not prejudice the Cartwrights in their defenses to the action.

(c) As for whether the Cartwrights knew or should have known that, but for a mistake concerning their identity as proper parties, Fuji would have asserted claims against them, as well as the Schoolers, in 2003, the trial court found that it was the Cartwrights' egregious, contumacious conduct in intentionally obstructing discovery of relevant financial documents that led to the delay in identifying them as proper parties and adding them as defendants in this action. We agree with the court's conclusion that "it is beyond disingenuous to suggest that they did not know that [Fuji] would have added them to this action long ago had it had in its possession the financial information the Cartwright Defendants fought so long

and hard to avoid producing."

Accordingly, the trial court did not err in finding that the relation-back statute, OCGA § 9-11-15 (c), applies and that the amendment to the complaint adding the Cartwrights as defendants relates back to the Schoolers' original filing of the lawsuit. *Ford v. Olympia Skate Center*, 213 Ga. App. 600, 601-602 (1) (445 SE2d 362) (1994).

3. The Cartwrights argue that the trial court's application of the relation-back statute, OCGA § 9-11-15 (c), in this case violates their constitutional right to be sued in Taylor County, where they currently reside. Specifically, they rely upon Ga. Const. of 1983, Art. VI, Sec. II, Par. VI, which states that, subject to some exceptions not applicable here, all civil cases against individuals "shall be tried in the county where the defendant resides[.]" As the Cartwrights concede, the appellate courts of this state have consistently construed this provision to mean that, in such cases, venue is determined based on the defendant's residence on the date the suit is filed. *Franek v. Ray*, 239 Ga. 282, 286 (236 SE2d 629) (1977); *HD Supply v. Garger*, 299 Ga. App. at 754 (1). It follows that, under such interpretation, a change of residence by the defendant after the filing of an action but before trial does not change the proper venue, so a defendant may not force a transfer of the case, unreasonably delay a trial, or avoid a trial altogether by simply moving between the filing of the case and the trial. See *Franek v. Ray*, 239 Ga. at 285; *HD Supply v. Garger*, 299 Ga. App. at 754 (1). Thus, the definitive fact that controls the location of the proper venue for a suit is in which Georgia county the defendant resides on the date the suit is filed.

(a) Under the relation-back statute, OCGA § 9-11-15 (c), a defendant who is added to a pending action "is treated as if [he or she] were a party to the original action from its inception." *HD Supply v. Garger*, 299 Ga. App. at 754-755 (1). In such a case, "venue over that defendant should be assessed *based upon the facts existing at the time the suit was originally filed*." (Emphasis supplied.) Id. at 754 (1).[6] Because the undisputed evidence in this case shows that the Cartwrights were not residents of Georgia when this suit was filed in 2003, the proper venue must be determined pursuant to Georgia's Long Arm Statute, OCGA §§ 9-10-91 and 9-10-93, as discussed in Division 4, infra. See OCGA § 9-10-90 (Under the Long Arm Statute, "the term 'nonresident' includes an individual . . . not residing [or]

---

[6] Although the Cartwrights argue that the holding in *HD Supply v. Garger* is inapplicable to this case because *HD Supply* involved the venue of a suit involving a corporate defendant, we note that the relevant portions of this Court's analysis and ruling do not make any distinction between a corporate defendant and an individual defendant. See *HD Supply v. Garger*, 299 Ga. App. at 754-755 (1).

domiciled . . . in this state at the time a claim or cause of action under Code Section 9-10-91 arises[.]"); *Goodman v. Vilston, Inc.*, 197 Ga. App. 718, 721 (2) (399 SE2d 241) (1990) ("[A]n individual who lives in another state does not 'reside' in Georgia" for constitutional venue purposes, so "venue against the nonresident individual is proper only where authorized by the Long Arm Statute.") (citation omitted).[7]

(b) Notwithstanding this conclusion, the Cartwrights argue that the trial court's application of OCGA § 9-11-15 (c) in this case violated the constitutional venue provision cited above by allowing a finding of venue as to them, as individual defendants, based on considerations other than their residence at the time they were added as defendants. However, the sole purpose of the trial court's application of OCGA § 9-11-15 (c) in this case was to determine *the date that the suit was filed*. Only *after* it concluded that, under the circumstances presented, Fuji's amendment adding the Cartwrights as defendants should relate back to the time the suit was originally filed — 2003 — did the court correctly find that, at that time, the Cartwrights were nonresidents of Georgia. As noted above, as nonresidents of the state, personal jurisdiction over the Cartwrights and the proper venue for the suit must be determined under Georgia's Long Arm Statute.

Accordingly, the Cartwrights have failed to demonstrate any constitutional violation by the trial court.

4. The Cartwrights contend that the trial court erred in finding, under Georgia's Long Arm Statute, (a) that it could exercise personal jurisdiction over them as nonresidents at the time the suit was filed and (b) that Fulton County was the proper venue for this suit.

(a) OCGA § 9-10-91 (2), which governs when a trial court may exercise personal jurisdiction over a nonresident, states, in relevant part, as follows:

> A court of this state may exercise personal jurisdiction over any nonresident . . . as to a cause of action arising from any of the acts [or] omissions . . . enumerated in this Code section, in the same manner as if he or she were a resident of this state, if in person or through an agent, he or she . . . [c]ommits a tortious act or omission within this state[.]

---

[7] In *Goodman v. Vilston, Inc.*, this Court explained that, "[w]hile the Long Arm Statute provides for jurisdiction and venue over the person of . . . an individual where he or she has minimum contacts with the forum, that statute does not make the non-Georgian a 'resident' of Georgia; it merely provides for exercise of a Georgia court's jurisdiction over the person." (Citation omitted.) 197 Ga. App. at 721 (2).

In this case, after the Cartwrights were added as defendants, Fuji amended its complaint to allege that they and the Schoolers jointly and severally committed tortious acts in this state, including ongoing breaches of fiduciary duty, active participation in a scheme and conspiracy to defraud Fuji, and the intentional concealment of evidence of their tortious acts. We agree with the trial court's conclusion that the Cartwrights' actions afford a basis for it to exercise personal jurisdiction over them in this suit, pursuant to Georgia's Long Arm Statute.

(b) Because the trial court is authorized to exercise personal jurisdiction over the Cartwrights in this case under the Long Arm Statute, the determination of the proper venue is governed by OCGA § 9-10-93, which states, in relevant part, as follows: "Where an action is brought against a resident of this state, any nonresident of this state who is involved in the same transaction or occurrence and who is suable under the provisions of this article may be joined as a defendant in the county where a resident defendant is suable."

As shown above, the Schoolers sued Fuji and Patten in the State Court of Fulton County in 2003, thereby submitting themselves to that court's jurisdiction and venue on Fuji's counterclaim. *M&M Mtg. Co. v. Grantville Mill*, 302 Ga. App. 46, 47-48 (1) (690 SE2d 630) (2010); *Kennestone Hosp. v. Hopson*, 264 Ga. App. 123, 124-125 (1) (589 SE2d 696) (2003).[8] Thus, the Schoolers are "suable" on Fuji's claims in Fulton County. It follows that, under OCGA § 9-10-93, Fulton County is the proper venue as to the Cartwrights, also. Accordingly, the court's finding that the Cartwrights were subject to this suit in Fulton County, pursuant to Georgia's Long Arm Statute, was not error.

*Judgment affirmed. Miller, P. J., and Doyle, J., concur.*

DECIDED NOVEMBER 8, 2011 —
RECONSIDERATION DENIED NOVEMBER 29, 2011 —

---

[8] In *Kennestone Hosp. v. Hopson*, this Court held as follows:
Regarding counterclaims, Georgia law has long held that a party that files suit in a Georgia court submits himself to that court's jurisdiction and venue relating to all matters directly connected with the case that he had originated. One who goes into the court of a county other than that of his residence, to assert a claim . . . , must be content to allow that court to determine any counterclaim growing out of the original suit which the defendant sees fit to set up by a cross-action.
(Citations and punctuation omitted.) 264 Ga. App. at 124-125 (1). Pretermitting whether the counterclaim must, in fact, involve matters "directly connected with" or "growing out of" the original suit for this rule to apply, the counterclaim asserted by Fuji in the instant case was sufficiently related to the Schoolers' original claim to meet such requirement. See id. at 125-126 (1), (2).

*McGuireWoods, George J. Barry III, Robert J. Waddell, Jr.*, for appellants.

*Finch McCranie, Michael A. Sullivan, Steven Salcedo, Sell & Melton, John A. Draughon, Michael D. Cooper*, for appellee.